

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00468-CR

_____

JASON WAYNE CARLILE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court No. 61,562-B

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant Jason Wayne Carlile appeals his convictions for aggravated sexual assault and sexual assault. We affirm.

### I.    BACKGROUND

Carlile was indicted for two counts of aggravated sexual assault of a minor we will refer to as Kate and seven counts of sexual assault of a minor we will refer to as Laura.[1] *See* Tex. Penal Code Ann. §§ 22.011, .021. He was arrested in November 2018. The trial court later dismissed the last count of sexual assault.

The early stages of the prosecution proceeded without incident. The State produced batches of potentially exculpatory documents on at least four occasions. In May 2019, Carlile requested a continuance, the State did not oppose, and the continuance was granted. In August 2019, Carlile filed another motion for continuance in which he alleged that two of his four retained mental health experts would be unavailable on the scheduled trial date and that they needed additional time to review the case files. At the hearing on the motion, the State warranted that it had fulfilled its discovery duty, stating on the record, "We have turned everything over in this case." This continuance was granted as well, and the case was reset for December 9, 2019.

However, as the trial setting drew near, the State produced two more batches of documents, one on November 19 and another on November 26. Carlile again moved

---

[1]We use aliases for these minors to protect their privacy. *See* Tex. R. App. P. 9.10(a)(3); *Ingerson v. State*, 559 S.W.3d 501, 503 n.3 (Tex. Crim. App. 2018).

for a continuance, citing the need for additional time to investigate the newly produced records and to retain experts to review them. Carlile also filed a motion to recuse, which was promptly denied. After an evidentiary hearing—the details of which we discuss later—the trial court denied Carlile's motion for continuance on December 3, 2019. The trial court later entered findings that most of the documents were straightforward and concerned subjects already known to the defense. According to the court's findings, Carlile had not established what additional time to investigate the documents would achieve, and he had not shown his diligence in investigating the documents. The belated production of documents and the denial of Carlile's motion for continuance are the subject of his first three issues on appeal.

Carlile's attorneys then moved to withdraw, claiming that they were unprepared for trial. The trial court denied the motion to withdraw on December 3.

On December 4, voir dire began. However, Carlile filed a mandamus petition in this court on the same day, and our stay brought the trial to a halt. In his filings, Carlile threatened that if he were not granted mandamus relief in the form of a continuance, his attorneys would purposefully take no part in the trial in order to create a violation of his right to effective assistance and ensure reversal on appeal. After review, we denied mandamus relief.

On December 8, Carlile petitioned for mandamus relief in the Texas Court of Criminal Appeals. In his filings, Carlile repeated his threat to boycott the trial if he were not granted relief. The court denied relief.

3

Once the mandamus proceedings concluded, trial resumed, and the State broached the topic of Carlile's threat to refrain from participating in the trial. The trial court offered Carlile time to confer with his attorneys about this plan, but after a fifteen-minute conference, Carlile's attorneys announced that they still did not plan to participate.

With Carlile's attorneys abstaining, the State and the trial court conducted a formal trial essentially on their own. During voir dire, the State screened the venire for prejudice. The State called and questioned several witnesses, and at one point, it initiated a hearing on the admissibility of its own expert. After the State rested, it asked the trial court to admonish Carlile about his Fifth Amendment rights and his right to testify. The nonparticipation of Carlile's attorneys is the subject of his fourth issue on appeal.

After hearing the evidence, the jury found Carlile guilty on both counts of aggravated sexual assault and six counts of sexual assault. For the counts of aggravated sexual assault, the jury assessed punishment at life imprisonment and a fine of $10,000. For the counts of sexual assault, the jury assessed punishment at twenty years and a fine of $10,000. The trial court sentenced Carlile accordingly, with the sentences to run consecutively.

## II.    DISCOVERY VIOLATIONS

In his first and second issues on appeal, Carlile argues that the State violated his rights by belatedly turning over hundreds of pages of records from the FBI and a clinic

4

that treated the complainant Kate. According to Carlile, the untimely production of these documents violated *Brady v. Maryland*,[2] the Michael Morton Act,[3] his due process rights,[4] and the prosecutor's duty to see that justice was done.[5]

The State responds that Carlile did not preserve these complaints. We agree with the State.

"The burden of preserving error for appellate review rests on the party challenging the trial court's ruling," usually the appellant. *Spielbauer v. State*, 622 S.W.3d 314, 318 (Tex. Crim. App. 2021). The burden is placed on the complaining party in order "to prevent blindside attacks on the trial court's rulings." *Id.*

Preservation requires a timely, specific objection or request. *Dixon v. State*, 595 S.W.3d 216, 223 (Tex. Crim. App. 2020). "An objection or request is sufficiently specific if the trial court is aware of the complaint or if the grounds are apparent from the context." *Gonzalez v. State*, 616 S.W.3d 585, 591 (Tex. Crim. App. 2020), *cert. denied*, No. 21-5327, 2021 WL 5043646 (Nov. 1, 2021). Magic words are not required, but the litigant must let the trial court know what he wants and why he feels himself entitled to it clearly enough for the judge to understand him. *Id.* A general objection will not

---

[2] 373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963).

[3] Tex. Code Crim. Proc. Ann. art. 39.14.

[4] U.S. Const. amend. XIV.

[5] Tex. Code Crim. Proc. Ann. art. 2.01.

preserve error unless the legal basis is obvious to the trial court and opposing counsel. *Id.* "A complaint is obvious if there are statements or actions on the record that clearly indicate what the judge and opposing counsel understood the argument to be." *Id.* (internal quotation omitted). "Parties are not permitted to bootstrap a constitutional issue from the most innocuous trial objection, and trial courts must be presented with and have the chance to rule on the specific constitutional basis for admission because it can have such heavy implications on appeal." *Golliday v. State*, 560 S.W.3d 664, 670 (Tex. Crim. App. 2018) (internal quotation omitted).

Carlile filed a four-page motion for continuance, but it did not mention any of the grounds he argues on appeal. At the hearing, Carlile's attorneys spoke at length about the underpinnings of their motion, and they cross-examined multiple witnesses concerning the need for a continuance. But at no point in the hearing did Carlile's attorneys mention, in connection with the FBI file or clinic record, any of the grounds he now raises on appeal. Nor did the context of the hearing make any of those grounds obvious. Rather, Carlile's arguments in the motion and at the hearing revolved solely around garden-variety continuance concerns: the need for more time to investigate the new documents and the leads they purportedly contained. Without a timely and specific objection or request, nothing is preserved for our review. *See Dixon*, 595 S.W.3d at 223. "A reviewing court should not address the merits of an issue that has not been preserved for appeal." *Ahn v. State*, No. 02-17-00004-CR, 2017 WL 6047670, at *6 (Tex. App.—Fort Worth Dec. 7, 2017, no pet.) (mem. op., not designated for

6

publication) (declining to review the merits of unpreserved *Brady* and Michael Morton Act arguments); *see Gonzalez*, 616 S.W.3d at 594 (same as to due process argument); *Martinez v. State*, No. 08-14-00130-CR, 2016 WL 4447660, at *6 n.5 (Tex. App.—El Paso Aug. 24, 2016, pet. ref'd) (not designated for publication) (same as to Article 2.01 argument).

Because Carlile's first and second issues are not preserved, we overrule them without respect to their merit.

### III.    CONTINUANCE

In his third issue, Carlile complains that the trial court erred by denying his motion for continuance after the State produced new documents shortly before trial. He asserts that the denial of a continuance deprived him of his rights to a fair trial and effective assistance of counsel.

Carlile filed his motion for continuance on November 27, 2019. He alleged that the district attorney had recently provided him with 252 pages of new FBI records pertaining to the case as well as 121 pages of new clinical records concerning Kate's treatment at Rose Street Mental Health Treatment. Carlile requested additional time to investigate the psychiatric care providers who were named in the Rose Street records and to retain experts to review the discovery. When the motion was filed, voir dire was set to begin the following week, on December 3. Carlile had previously sought and obtained two continuances.

7

At the hearing on Carlile's motion, the State gave a timeline of events through witnesses and unchallenged factual representations on the record.[6] By early November, the State believed it had turned over all the necessary discovery to the defense—"everything that we had in our possession," the State's investigator testified. However, later in November, the State learned of a previously unknown FBI file concerning a 2006 investigation of Carlile; no sexual abuse was disclosed during the investigation, and ultimately, federal authorities elected not to prosecute Carlile. The State received the FBI file on November 19 and turned the file over to the defense "immediately," two weeks before voir dire was set to commence. The State represented that of the 252 pages in the file, approximately 150 pages had already been provided to the defense "on multiple occasions" because Carlile had received files containing the same documents. Of the 100 newly produced pages, some contained narrative accounts and notes drafted by the FBI agent who investigated Carlile. Much of the rest was administrative forms, "just stuff that the government checks a box off on one piece of paper and goes to the next." The FBI file did contain 41 names of people involved in the FBI inquiry who had not previously been mentioned in discovery.

---

[6]*See Trevino v. State*, 864 S.W.2d 499, 501 n.2 (Tex. Crim. App. 1993) (relying on counsel's unchallenged representations on the record as support for findings of fact and conclusions of law); *see also Comeaux v. State*, 445 S.W.3d 745, 748 (Tex. Crim. App. 2014) (taking counsel's unchallenged representations on the record as established fact for purposes other than evidentiary sufficiency); *Watkins v. State*, 245 S.W.3d 444, 451 (Tex. Crim. App. 2008) (same); *Pharris v. State*, 165 S.W.3d 681, 688–89 (Tex. Crim. App. 2005) (same).

As to the Rose Street records, the evidence showed that those, too, had only recently been discovered and had promptly been produced to the defense. Early on in the case, the office manager of Rose Street wrote a letter to the district attorney's office stating that any records of Kate's treatment between 2007 and 2010 had been destroyed. However, in the week before the continuance hearing, Rose Street informed the State that it did have some of Kate's records after all. The State's investigator went to pick those records up "within the hour" that he learned of them on November 26 and he turned them over to the defense "as soon as" he obtained the records. The Rose Street records documented a counselor's observations of Kate and the medications she was taking. Like the FBI file, the Rose Street records reflected that Kate did not disclose any sexual abuse at that point.

After hearing the arguments and evidence, the trial court denied Carlile's motion for continuance. The trial court later entered detailed findings of fact and conclusions of law.

As to the FBI file, the court found that the file was produced to the defense on November 19, 2019, and that the evidentiary portion of trial was set for December 10, 2019, at which point Carlile would have had the FBI file for 21 days. The findings stated that the newly produced pages in the FBI file consisted of 40 pages of administrative forms, 9 pages of grand jury subpoenas, and 54 pages of narrative. The court further found that from "previous disclosures made by the State, the defense was well aware of the prior federal investigation" and "possessed voluminous records

9

relating to that investigation." But the court found that "[t]he defense wholly failed to show at the hearing what steps it had taken to follow up on the records that had been previously disclosed and why the additional records offered anything new about the FBI investigation of which the defense was not already aware." It continued, "While the defense listed some new names in the additional records, the defense failed to articulate what significance those names had, what steps the defense had taken to investigate those records, or why anyone listed in those records would be material to the defense in the case." Thus, the trial court concluded that the defense failed to carry their burden to show why the FBI file necessitated a continuance.

As to the Rose Street records, the court found that these 121 pages of therapy records were produced to the defense on November 26, 2019, "immediately upon the State's receipt of those records from Rose Street Mental Health." The records discussed Kate's mental health, therapy, and medications. By the time of trial, Carlile would have had the Rose Street records for 14 days. According to the court, the records were "straightforward, not particularly complex, and not relevant to the issues raised in Defendant's charges." The court further noted Carlile had already designated four mental health experts, but none of them had testified as to why the Rose Street records were relevant, what effort they had made to investigate the records, what additional investigation might yield, or why the records required further delay.

Based on these circumstances, the court concluded that Carlile's "eve-of-trial motion for continuance was not supported by the necessary sworn testimony, . . . that

10

the defense failed to carry its burden, and that it was baseless and sought solely for delay." Carlile does not challenge these findings and conclusions on appeal.

The truth, merit, and sufficiency of the grounds for continuance "shall be addressed to the sound discretion" of the trial court and "shall not be granted as a matter of right." Tex. Code Crim. Proc. Ann. art. 29.06(6). We therefore review the trial court's ruling on a motion for continuance for an abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). A trial court does not abuse its discretion unless its ruling lies outside the zone of reasonable disagreement. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). Under this standard, we view the evidence in the light most favorable to the trial court's ruling. *State v. Thomas*, 428 S.W.3d 99, 104 (Tex. Crim. App. 2014).

As a general rule, we afford almost total deference to a trial court's determination of the historical facts that the record supports, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor. *Green v. State*, 374 S.W.3d 434, 441 (Tex. Crim. App. 2012). We afford the same amount of deference to the trial court's rulings on questions concerning the application of law to fact if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Id.* We review de novo mixed questions of law and fact that do not hinge

on assessments of credibility and demeanor. *Id.* We review a trial court's determination of legal questions de novo. *State v. Arellano*, 600 S.W.3d 53, 57 (Tex. Crim. App. 2020).

Carlile asserts that the denial of a continuance infringed his constitutional rights to a fair trial and effective assistance of counsel. The appellant in *Gonzales v. State* likewise argued that the denial of his motion for continuance "deprived him of various of his constitutional rights." 304 S.W.3d 838, 841 (Tex. Crim. App. 2010) (cleaned up). The court held that in order to show reversible error predicated on the denial of a pretrial motion for continuance, the appellant is required to demonstrate both that the trial court abused its discretion by denying the motion and that the lack of a continuance harmed him. *See id.* at 842–43. Thus, the requirements to establish an abuse of discretion and prejudice apply when, as here, the appellant attempts to infuse the denial of a continuance with special constitutional significance. *See id.*; *Gallo*, 239 S.W.3d at 764 (holding same as to alleged deprivation of effective assistance and due process through denial of continuance).

To show an abuse of discretion, the appellant should make a "showing that the case made for delay was so convincing that no reasonable trial judge could conclude that scheduling and other considerations as well as fairness to the State outweighed the defendant's interest in delay of the trial." *Gonzales*, 304 S.W.3d at 843; *Nichols v. State*, No. 02-13-00566-CR, 2014 WL 7779272, at *1 (Tex. App.—Fort Worth Feb. 5, 2014, pet. ref'd) (mem. op., not designated for publication). To show prejudice, the appellant should show "with considerable specificity how the defendant was harmed by the

absence of more preparation time than he actually had," such as by demonstrating "what additional information, evidence[,] or witnesses the defense would have had available if the motion for delay had been granted." *Gonzales*, 304 S.W.3d at 842–43; *Kerr v. State*, Nos. 02-20-00034-CR, 02-20-00035-CR, 2021 WL 3793817, at *3 (Tex. App.—Fort Worth Aug. 26, 2021, no pet.) (mem. op. on reh'g, not designated for publication). "That counsel merely desired more time to prepare does not alone establish an abuse of discretion." *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996). The assertion that counsel did not have time to adequately investigate medical records for potential mitigating evidence without any showing of harm likewise fails to establish an abuse of discretion. *Heiselbetz v. State*, 906 S.W.2d 500, 512 (Tex. Crim. App. 1995).

The uncontested findings, which are supported by the record, show that the trial court did not abuse its discretion by denying the motion for continuance. Carlile's trio of attorneys had already had over a year to prepare for the December trial setting, having previously obtained two continuances, and he did not specify the amount of additional time he might require for his third continuance, giving the trial court no sense of how long justice would be delayed. *See Rosales v. State*, 841 S.W.2d 368, 374 (Tex. Crim. App. 1992) (listing "the length of delay requested" and "whether other continuances were . . . granted" as factors relevant to the need for continuance in some contexts). Most of the documents were duplicative of other discovery, and many of the rest were dry administrative forms. The court found that Carlile already had

"voluminous records" concerning the FBI inquiry, and he offered no reason to believe that the 100 pages of newly produced documents concerning the same issue might materially impact his case if he were given more time to investigate. Absent was any evidence of harm, such as that inadequate preparation time with respect to the FBI file gave rise to "unfair surprise, an inability to effectively cross-examine the State's witnesses, or the inability to adduce crucial testimony that could have been given by potential witnesses." *Dotson v. State*, 146 S.W.3d 285, 297 (Tex. App.—Fort Worth 2004, pet. ref'd) (citing *Janecka*, 937 S.W.2d at 468).

As for the Rose Street records, there was a clear incongruity between, on the one hand, Carlile's professed need to retain new experts to review the records and, on the other hand, Carlile's notice that he could call up to four different retained psychological experts at trial. According to the findings, Carlile offered no proof that his team of lawyers and experts had undertaken due diligence as to the records and no proof that further time and attention to the records would generate additional material for trial. Just the opposite, the content of the records was straightforward and irrelevant according to the trial court, which further suggested that Carlile's demand for a continuance based thereon was a "contrived reason[]" for delay. *See Rosales*, 841 S.W.2d at 374.

In sum, Carlile offered no evidence to justify imposing the "inconvenience [on] the witnesses, the opposing counsel, and the trial court" that a continuance would represent. *See id.*; *Phifer v. State*, No. 05-18-01232-CR, 2020 WL 1149916, at *12 (Tex.

14

App.—Dallas Mar. 10, 2020, pet. ref'd) (mem. op., not designated for publication) (concluding, based on similar considerations, that the trial court did not abuse its discretion by denying a continuance for further inquiry into 850 pages of newly produced documents); *Reichle v. State*, No. 06-14-00073-CR, 2015 WL 392846, at *8–9 (Tex. App.—Texarkana Jan. 30, 2015, pet. ref'd) (mem. op., not designated for publication) (same, 250 pages); *Suazo v. State*, No. 03-08-00460-CR, 2010 WL 5018971, at *3–4 (Tex. App.—Austin Dec. 10, 2010, no pet.) (mem. op., not designated for publication) (same, 110 pages); *Baxter v. State*, No. 07-99-0412-CR, 2001 WL 360677, at *1 (Tex. App.—Amarillo Apr. 11, 2001, no pet.) (not designated for publication) (same, 216 pages).

We overrule Carlile's third issue.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

In his fourth issue, Carlile submits that he was denied his constitutional rights to effective assistance of counsel and a fair trial. As Carlile points out, his trial attorneys "conducted no voir dire, exercised no peremptory strikes, made no opening statement, examined no witnesses, made no objections, presented no defense, made no closing argument and presented nothing on punishment." "Defense counsel did not even 'fog a mirror' during trial," he argues. According to Carlile, this was a violation of his Sixth Amendment rights.

However, that is apparently how Carlile and his attorneys wanted it. After Carlile's motion for continuance was denied, his counsel began a boycott of the trial,

saying, "Your Honor, because we don't have an expert to review the records that were received by us on the 19th and November 26th, I do not know how to effectively voir dire this panel. I rest." In his mandamus filings, Carlile explained the motive behind his attorney's nonparticipation: he vowed that if he were not granted mandamus relief in the form of a continuance, his attorneys would "say nothing" during trial "so that even a blind, deaf and dumb appellate court will have no choice but to conclude that Relator was denied his constitutionally-guaranteed effective assistance of counsel." In a mandamus petition before the court of criminal appeals, Carlile stated that this boycott would extend to all phases of the trial.

When the stays were lifted and the trial recommenced, the State began the proceeding by narrating into the record a portion of the mandamus filings in which Carlile's attorneys had threatened to refrain from participating in the trial. The State urged Carlile to rethink the matter, and the trial court offered Carlile time to confer with his attorneys about reconsidering their "plan of action." But after a fifteen-minute conference, Carlile's attorneys returned and announced that they still did not plan to participate. At trial, Carlile's attorneys did not subsequently voice any argument, lodge any objections, present any evidence, or otherwise take part in the adversarial process.

Carlile maintains that he was denied effective assistance. He further submits that because the deprivation was so complete, prejudice should be presumed under the rule of *United States v. Cronic*, 466 U.S. 648, 658–59, 104 S. Ct. 2039, 2046–47 (1984).

16

But as we explain, *Cannon v. State* sets out relevant points of distinction that anticipated cases like this one, where defense counsel's failure to participate in the adversarial process appears to be intentional, strategic, and with the defendant's blessing. *See* 252 S.W.3d 342, 350 (Tex. Crim. App. 2008) (op. on reh'g). *Cannon* shows that where these signs of artifice are present, there should be no relief on grounds of ineffective assistance despite counsel's failure to participate in trial.

In order to establish ineffective assistance of counsel, an appellant must usually demonstrate both deficient performance and prejudice. *Id.* at 348–49. That is, he must demonstrate that (1) defense counsel's performance fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 349. "However, if an appellant can demonstrate that defense counsel 'entirely failed to subject the prosecution's case to meaningful adversarial testing,' so that there was a constructive denial of the assistance of counsel altogether, then prejudice, because it is 'so likely,' is legally presumed." *Id.* (cleaned up) (quoting *Cronic*, 466 U.S. at 658–59, 104 S. Ct. at 2046–47). If there is a "complete denial" of assistance of counsel, the Sixth Amendment is violated. *Cronic*, 466 U.S. at 659, 104 S. Ct. at 2047.

In *Cannon*, this rule was applied to facts that, at least superficially, resemble those before us. There, as here, counsel for the defendant presented an oral motion for continuance and a written motion to recuse on the first day of trial. *Cannon*, 252 S.W.3d at 343. The motion to recuse explained that counsel had recently filed an ethics

17

complaint against the trial judge for biased treatment in another case. *Id.* at 344. The trial judge denied the motion to recuse out of hand. *Id.* Defense counsel then announced that he was not ready for trial, that he would be unable to effectively represent his client, and that he could not participate in the trial. *Id.* The trial judge denied the motion for continuance and began the trial. *Id.* Throughout the proceedings, counsel protested that he was unable to effectively represent his client under the circumstances, and he refused to participate in most stages of the case. *See id.* at 344–46.

The court of criminal appeals held that these facts presented one of the "rare" instances when there was a complete denial of counsel, justifying a presumption of prejudice. *Id.* at 350. However, in reaching this holding, the court specially noted the absence of three conditions. *See id.* First, it noted the absence of any indication in the record that counsel was acting on an improper "motive" when he professed to be unprepared; the court elected to "take counsel at his word" and "not speculate that he may have had some other motive for his behavior" that was not concretely shown by the record. *See id.*; *see also Wenzy v. State*, 855 S.W.2d 47, 50 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd). Second and third, the court noted "the record contains no suggestion that appellant failed to cooperate with defense counsel, or that appellant directed, agreed with, or acquiesced in defense counsel's behavior." *Cannon*, 252 S.W.3d at 350. The court went on to summarize other cases in which similar ineffective-assistance claims were rejected, usually because one of these three conditions was

present.  *See id.* at 350–52 (summarizing *Martin v. McCotter*, 796 F.2d 813, 820 (5th Cir. 1986), *United States v. Sanchez*, 790 F.2d 245, 253–54 (2d Cir. 1986), and *Warner v. Ford*, 752 F.2d 622, 625 (11th Cir. 1985)).

The case before us embodies two of the conditions identified in *Cannon* as points of distinction whereupon relief may not be available despite counsel's nonparticipation in trial.  First, we need not speculate as to whether Carlile's attorneys had an improper motive because, as the State accurately put it, "Carlile and his attorneys spread their joint motive all over the record."  Carlile's mandamus filings with this court and the court of criminal appeals expressly stated that the goal was to manufacture a Sixth Amendment violation and, with it, a certainty of reversal on appeal.  At trial, counsel's message was somewhat different; counsel claimed to be unprepared because of the belated production of documents by the State.  However, the circumstances did not suggest a genuine lack of preparedness on counsel's part.  Carlile's three retained attorneys had over a year to prepare for the trial and four mental health experts available to call.  Yet counsel were claiming to be wholly unprepared because they had inadequate time to retain a mental health expert and to investigate records that the trial court deemed largely irrelevant, duplicative, and uncomplicated.  The trial court could have rationally concluded that this claimed unreadiness was merely a pretext for the motive Carlile expressly set out in his mandamus filings.

A second condition from *Cannon* is also present:  there was some indication that Carlile was aware of his attorneys' calculation and that he acquiesced in it.  As soon as

19

the mandamus proceedings concluded and trial resumed, the first item of business that was taken up was the threat of nonparticipation. The State recited—in open court and in Carlile's presence—his own filings back to him, wherein his attorneys had vowed to sabotage the trial if not granted relief. The State urged Carlile to reconsider and to confer with his attorneys. The trial court asked counsel, "do you need time to confer with your client or is your plan of action already planted in cement?" Counsel indicated that they would like to confer with Carlile. After a fifteen-minute conference, counsel returned and announced, "we do not plan to present any voir dire or make any objections in the case." A fair inference from this scene is that Carlile was made aware of and acquiesced to his attorney's gambit to put on no defense. *See Little v. State*, 819 N.E.2d 496, 503 (Ind. Ct. App. 2004) (relying in part on appellant's presence at hearings where the alleged ineffectiveness—a defect in his attorney's licensure—was discussed prior to trial in order to establish appellant's foreknowledge of and tacit assent to the ineffectiveness).

This ploy and Carlile's acquiescence to it weigh heavily against a finding of ineffective assistance.[7] *See People v. Aiken*, 380 N.E.2d 272, 275 (N.Y. 1978) ("[W]e emphasize that a defendant who absents himself from trial may not succeed on appeal by raising counsel's purported ineffectiveness where counsel affirmatively, as a matter

---

[7]We express no opinion on which or how many of the conditions identified in *Cannon* must be present before counsel's nonparticipation in trial will be rejected as a basis for an ineffective-assistance claim. We only hold that where these two conditions are present, no Sixth Amendment violation will be found.

of trial strategy, sought to obstruct the trial of his client."). "There is no room in our profession for the playing of games." *Ortega v. State*, 644 S.W.2d 912, 913 (Tex. App.—Fort Worth 1983, no pet.) (en banc). "A defendant may not create reversible error by his own manipulation." *Beasley v. State*, 634 S.W.2d 320, 321 (Tex. Crim. App. [Panel Op.] 1982). This principle has found many iterations. For instance, a trial court does not err when it denies a mistrial based on the defendant's own outbursts during the proceedings, *see George v. State*, 446 S.W.3d 490, 503 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd), or when it denies a motion for continuance where the defendant has voluntarily absented himself during trial, *see Martin v. State*, 727 S.W.2d 820, 823 (Tex. App.—Fort Worth 1987, no pet.). No appellate relief is in order when the defendant himself was the source of the impermissible conversation with jurors that he attacks on appeal, *see Franks v. State*, 961 S.W.2d 253, 255 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd), or when he protests about the lack of a sentencing pronouncement that he himself interrupted, *see Hawkins v. State*, No. 02-15-00338-CR, 2016 WL 4474351, at *7–8 (Tex. App.—Fort Worth Aug. 25, 2016, pet. ref'd) (mem. op., not designated for publication).

The same estoppel logic that runs through these cases also runs through the invited-error rule. *See Prystash v. State*, 3 S.W.3d 522, 531 (Tex. Crim. App. 1999). The law of invited error provides that a party cannot take advantage of an error that it invited or caused, even if the error involves an absolute or waivable-only right. *Woodall v. State*, 336 S.W.3d 634, 644 (Tex. Crim. App. 2011); *Parnell v. State*, No. 02-19-00070-CR, 2020

WL 5666565, at *5 (Tex. App.—Fort Worth Sept. 24, 2020, pet. ref'd) (mem. op., not designated for publication). "In other words, a party is estopped from seeking appellate relief based on error that it induced." *Woodall*, 336 S.W.3d at 644. "To hold otherwise would be to permit him to take advantage of his own wrong." *Id.*

One Texas court has applied the invited-error rule to dispose of a fair-trial claim such as the one Carlile brings here. *See Moreno v. State*, No. 04-01-00406-CR, 2002 WL 1573426, at *5 (Tex. App.—San Antonio July 17, 2002, no pet.) (not designated for publication). Texas courts have also extended the invited-error rule to ineffective-assistance claims. *See Aguirre v. State*, No. 11-11-00313-CR, 2013 WL 5776948, at *1 (Tex. App.—Eastland Oct. 24, 2013, no pet.) (mem. op., not designated for publication); *In re R.S.*, No. 14-08-01013-CV, 2009 WL 3191515, at *5 (Tex. App.—Houston [14th Dist.] Oct. 1, 2009, pet. denied) (per curiam) (mem. op.); *see also Love v. State*, 600 S.W.3d 460, 481 & n.15 (Tex. App.—Fort Worth 2020, pet. ref'd). Finally, courts have found that the case for invited error is stronger where, as here, the defendant knows of the allegedly ineffective stratagem and acquiesces to it. *See People v. Velez*, 903 N.E.2d 43, 52–53 (Ill. App. Ct. 2009); *Little*, 819 N.E.2d at 503; *Lahmann v. State*, 509 S.W.2d 791, 795 (Mo. Ct. App. 1974) (rejecting ineffective-assistance claim because "[t]he tactic of counsel sitting mute during the trial was with the knowledge and approval of the appellant"; granting relief on such a tactic would be "inimical to the proper functioning" of the justice system).

We join the ranks of these courts. "Appellant and his counsel intentionally and knowingly followed a course of action and 'gambled' on its success." *Lahmann*, 509 S.W.2d at 795. "To reward such tactics would defy both the purposes of the Sixth Amendment and common sense." *Sanchez*, 790 F.2d at 254. Because Carlile knew of and acquiesced in the deliberate fabrication of the error that he complains of on appeal, any error was invited, and his claims of ineffective assistance and an unfair trial are rejected. We overrule his fourth issue.

## V. CONCLUSION

We affirm the judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: November 24, 2021